**FAUBER v. UNITED STATES.**

No. 41941.

Court of Claims.

March 3, 1941.

Gorham F. Freer, of Washington, D. C., for plaintiff.

C. P. Goepel, of New York City, and Francis M. Shea, Asst. Atty. Gen. (Frank H. Harmon, of New York City, on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, and GREEN, Judges.

LITTLETON, Judge.

By certain amended petitions and a supplemental bill of particulars filed subsequent to the filing of the original petition there is placed in issue claims 1, 2, 5, and 6 of patent 971029, hereinafter sometimes referred to as the first patent, and claims 1, 2, 4, 5, and 29 of patent 1024682, hereinafter sometimes referred to as the second patent. The first patent was for a "Hydroplane Boat" and the second patent for "Construction of Boats and Ships". The inventor, William H. Fauber, to whom the patents were issued, died July 29, 1928, and the plaintiff, his widow, is the duly appointed and acting administratrix of his estate. The patents in suit expired September 27, 1927, and April 30, 1929, respectively, less than six years prior to the filing of the original petition on April 26, 1932. The main questions now before the court for consideration are (1) whether all or any of the claims of the patents in suit are valid and, if so, whether those that are valid have been infringed by the defendant's structures which plaintiff alleges embody the inventions. Certain other questions raised by the defendant relating to the right of plaintiff to maintain this suit are (1) that the estate of Fauber has no right, title, or interest in any of the claims of the patents in suit because of a prior transfer and assignment of both patents by the decedent; (2) that the patents are for hydroplane boats constantly immersed in water, and that the manufacture and use of

a hull for alighting upon and ascending from the water may not be included in the invention of the patentee; and (3) that the statute of limitation bars recovery and requires that the petition be dismissed for the reason that the evidence submitted does not establish any manufacture or use by the defendant of any of the alleged infringement structures within a period of six years prior to the filing of the original petition. The last three questions will be disposed of first.

The assignment executed by patentee Fauber on June 27, 1923, of certain interests in the patents in suit to Gar Wood, Inc., upon which counsel for defendant rely in support of their contention that the estate is not entitled to maintain this suit is set forth in finding 6. Under this instrument patentee Fauber, on June 27, 1923, made a limited transfer of interest in the patents here in issue to Gar Wood, Inc., of Detroit, but counsel for defendant contend that under the language of this assignment Fauber divested himself of his entire right, title, and interest in and to each of the patents in suit and all rights thereunder, together with the right to sue for and recover profits and damages for past or future infringement of any or all of the claims of said patents; that every right granted to Fauber by the Patent Office, including the right to prohibit others, passed under the assignment to Gar Wood and that the effect of the assignment was to vest full title in Gar Wood necessitating the bringing of this suit in the name of that corporation as the holder of title to the two patents in suit. We cannot agree. The language of the instrument and the evidence of record with reference to the circumstances and conditions under which the assignment was made show that Fauber gave to Gar Wood all rights under the patents only "insofar as they relate to the exclusive use thereof in connection with the manufacture, use, and sale of hydroplane boats or the like, primarily designed not to leave the surface of the water and not including toy and model boats too small to carry one person, together with the right to sue for and recover profits and damages for past or future infringement of any one or all of said patents." The rights to exclusive use thus granted were clearly limited and by the plain language of the instrument there was reserved to Fauber all rights under the patents pertaining to hydroplane boats or the like, primarily designed to leave the surface of the water—such boats, of course, being the hulls or floats of the hydroaeroplanes. Fauber thus gave Gar Wood exclusive rights in a limited field and did not part with title to the patents. Gamewell Fire-Alarm Telegraph Co. v. City of Brooklyn, C.C., 14 F. 255, 256. In that case the court said: "The right transferred was not an undivided part of an entire patent, or an undivided part of the entire interest of the patentee in specified territory, but was a segregated right for a particular employment of the invention. The complainant was, therefore, merely a licensee, within the rule established in Gayler v. Wilder, 10 How. 477, [13 L.Ed. 504]; the right transferred to him being less than that of the entire and unqualified monopoly."

While an exclusive licensee as to one field of use, the assignee Gar Wood was a nonexclusive licensee under the patents, and, as such, was not even a necessary party plaintiff since its interests are not affected by the claim made in the present suit which involves only hydroplane boats primarily designed to leave the water. As was said by the court in Mallory & Co., Inc., v. Automotive Manufacturers' Outlet, Inc., D.C., 45 F.2d 810, 813: "Even though one be an exclusive licensee if the license is limited to a particular field, territorially or commercially, and is not claimed to be invaded, such licensee is not affected and no good purpose would be served by forcing it to become a party plaintiff."

Inasmuch as the present claim relates only to the defendant's use of Fauber's invention on the hulls and pontoons of hydroaeroplanes, it follows that suit upon the claim presented was properly brought in the name of the administratrix of the estate of Fauber.

We can find no merit in defendant's next contention that the pontoons or hulls of the alleged infringing structures are not hydroplane boats because they are provided with wings. When defendant's seaplanes are on the water, their pontoons or hulls, having hydroplaning surfaces, are, we think, undeniably hydroplane boats and are within the inventions specified in the claims of the patent in suit; as such hydroplane boats, they are subject to all the laws pertaining to boats, and, when in the air, the pontoons, or hulls, are still boats although not functioning as such. The date, at which the inventor Fauber first knew of the utility of his hydroplane boats as parts

of a hydroaeroplane is unknown, but the evidence clearly shows that he had this knowledge as early as 1912; but whether he knew of it at all is immaterial for he was entitled to all the uses of his invention. Diamond Rubber Company of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527. In that case the court said: "A patentee may be baldly empirical seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor. And how can it take from his merit that he may not know all of the forces which he has brought into operation?"

In view of the facts and circumstances disclosed by the record, we cannot sustain the next contention of the defendant that the petition should be dismissed for failure of plaintiff to make out a prima facie case by showing manufacture or use of one or more of the defendant's alleged infringing structures within a period of six years from April 26, 1926, to April 26, 1932, the last date being the date on which the original petition was filed. Section 156 of the Judicial Code, 28 U.S.C.A. § 262, provided in part that "Every claim against the United States cognizable by the Court of Claims, shall be forever barred unless the petition setting forth a statement thereof is filed in the court * * *, as provided by law, within six years after the claim first accrues. * * *"

Standing alone, the provisions of this section, being a part of the Act of March 3, 1911, 36 Stat. 1135, 1139, would limit plaintiff's right to recover as to the first patent to a period of one year and five months from April 26, 1926, to September 27, 1927, the last date being the date of expiration of this patent; and as to the second patent, the right of recovery would be limited to a period of three years from April 26, 1926, to April 30, 1929, the last date being the expiration date of this patent. We are of opinion, however, that the provisions of the special jurisdictional act of March 3, 1931, quoted in finding 2, effectively waived any statute of limitation or lapse of time which might otherwise be a bar to the right of the administratrix of the estate of Fauber to maintain suit and recover compensation, or either, for the unauthorized use at any time by the defendant of either of the Fauber patents. This interpretation of the jurisdictional act is based upon the reasons for its enactment as disclosed by the facts before the Congressional Committees, and of record here, and the facts and reasons set forth by those committees recommending the enactment of the statute. Identical bills from which S. 3230 became the jurisdictional act of March 3, 1931, 46 Stat. 2134 (Part 2), were introduced, in the House and Senate prior to January 23, 1930. At the time these bills were introduced, and on March 3, 1931, when the jurisdictional act in question was approved, plaintiff had a right without any special act to institute suit in this court under the act of June 25, 1910, as amended by the act of June 1, 1918, U.S.Code, Title 28, § 68, 28 U.S.C.A. § 68, for the recovery of compensation for the manufacture or use, or either manufacture or use, by the defendant of any structures infringing all or any of the claims of either, or both, of the patents within a period of six years prior to the filing of such petition. At that time the limitation period specified in section 156 of the Judicial Code, supra, would have reached back to March, 1925, which was a date two years and six months prior to the expiration date of the first patent on September 27, 1927, and four years and nearly two months prior to the expiration date of the second patent on April 30, 1929. In the report of the committee of the judiciary, House Report No. 2450, 71st Congress, 3d Sess., which was adopted by the Senate Committee on Claims recommending the passage of the jurisdictional act which was subsequently enacted and approved on March 3, 1931, it was stated in part as follows:

"The following facts appear to be conceded: * * * 2. That the Navy Department, some time prior to the late war, adopted and made use, on their hydroplanes, of the hull covered by these inventions. 3. That they have continued to use this patented hull ever since, are still using the same, and in letters dating back as far as 1917, the Navy Department admitted the use thereof, suggested to him [Fauber] that he had a claim and that he should press the same in the Court of Claims. 4. That the Government never made settlement with Mr. Fauber, nor with his estate, for the use of this patented article. 5. That for some reason Mr. Fauber neglected to present his claim to the Court of Claims and it is now barred by the statute of limitations and can not be presented without the adoption of legislation as embodied in this bill.

"It is the opinion of your committee that the late Mr. Fauber, being the owner of

this patented article and it being conceded that the Government has appropriated and is using the same, his heirs should be permitted to bring this claim before the Court of Claims for adjudication, notwithstanding the bar by the statutes."

The committee then proceeded to set forth in the reports the following:

A letter of August 8, 1917, to the decedent, Fauber, from the Naval Consulting Board, in which Fauber was advised in part that "The law provides that when the Government so uses any patents, the owner may make claim upon the Government for royalty in the Court of Claims, but that does not debar the Government from making arrangements in advance with the owners of the patents if the Government considers it expedient."

A letter of August 22, 1917, from the chairman of the Primary Examiners' Advisory Committee of the Patent Office advising Fauber that "Your remedy is by suit in the United States Court of Claims on your patents unless you have made, or enter into, an agreement with the War or Navy Departments."

A letter of March 27, 1930, from the Acting Secretary of the Navy to the Chairman of the Senate Committee on Claims stating in part that:

"The records of the Navy Department show that Mr. Fauber first presented his claim to the Navy Department on August 1, 1917; that from that date until March, 1928, Mr. Fauber frequently advanced his claim to the Navy Department or to various bureaus thereof.

"With regard to the Fauber claim, the Navy Department, from the outset, has been of the opinion that the questions of infringement and validity of the Fauber patents were so controversial in nature as to require an adjudication by a court of competent jurisdiction before an expenditure of Government funds on the basis of such patents could be justified. As a result of this position on the part of the Navy Department, Mr. Fauber was repeatedly given to understand that he could not look to the Secretary of the Navy for a settlement of his claim.

"It is noted that the proposed legislation does not go to the merits of the claim but merely to the removal of the Statute of Limitations as a bar to an action in the Court of Claims.

"Nothing in the records of the Navy Department is pertinent to the question as to whether or not Mr. Fauber's delay in resorting to the Court of Claims was excusable."

Also, a letter of February 15, 1940, from the Secretary of War to the Chairman of the Senate Committee on Claims stating in part as follows:

"The existing law that may be said to be affected by the enactment of the foregoing bill is section 156 of the Judicial Code of the United States, which requires action to be commenced in the Court of Claims within six years after the claim first accrues. The purpose of the foregoing bill is clearly to waive the operation of this statute of limitations with respect to the instant claim.

"Undoubtedly the merit of a bill, such as the foregoing, is primarily to be determined by a study of the facts at hand, showing the degree of diligence with which the claimant has endeavored to protect his interest since the claim first arose. As has already been stated, the statute of limitations gives every claimant six years in which to bring a suit against the United States in the Court of Claims. This must be taken to be ample time, and in the ordinary case a claimant would not be entitled to an extension thereof unless the facts show that he has been prevented from bringing his suit within the period prescribed by the statute, for reasons beyond his control. In other words, the facts should show the claimant to be free from laches.

\* \* \* \* \* \*

"Mr. William H. Fauber first presented his claim to the War Department in a letter dated April 26, 1926, and it is believed that he addressed a similar letter to the Secretary of the Navy on the same date. The claim was carefully studied in the office of the Judge Advocate General and in the office of the Chief of Air Corps, and was formerly denied by the War Department in a letter to Mr. Fauber under date of December 2, 1926. The specific ground for denial was that the War Department was without legal authority to make a settlement of the claim for unliquidated damages, and Mr. Fauber was advised that his remedy, if any, was by action in the Court of Claims.

"It would seem from the above facts that there was laches on the part of Mr. Fauber in waiting until 1926 to make his formal claims against the Government. It can be said in his favor, however, that from the time he made his formal claim Mr. Fauber showed due diligence at all times in his efforts to accomplish a settlement by negotiation. He also submitted his inventions

to the Patents and Design Board, created by section 10 (r) of the act of July 2, 1926. His application for an award from this board, however, was denied.

"Another question which seems to present itself is whether or not the enactment of the proposed bill is necessary in order to permit the claimant to bring an action in the Court of Claims. I am advised that the claimant could bring such a suit without the aid of Congress and could recover damages for any infringements of the patents concerned that may have occurred within the past six years. Of course, two of these patents expired in 1927 and 1929, respectively, and no recovery as to them could be had for uses occurring after their expiration dates. It is realized that the recovery in such a suit, assuming that infringement could be proved, would be relatively small, as it would not extend to the war-time procurements. This no doubt is the reason why the claimant has appealed to Congress for the enactment of the proposed bill.

"Although the history of this case, as outlined above, does not seem to show any reasons for extending the period established by the statute of limitations, I am mindful of the fact that the present claimant, in whose interest the bill has been introduced, has not been guilty of laches. I also feel that any departmental recommendation which might serve as a guide to your committee in its deliberations upon the bill should, in the instant case, come from the Navy Department. For these reasons, I feel constrained to express no opinion as to the enactment of the proposed legislation."

In view of these and other similar facts which were before the committees and were included in their reports recommending the passage of the bill in the form in which it was finally enacted, we are of opinion that the intent and purpose of Congress when conferring jurisdiction upon this court to hear, examine, and adjudicate and render judgment on the claim of plaintiff "notwithstanding the lapse of time or the statute of limitations" was to waive and remove any bar under section 156 of the Judicial Code which would otherwise operate as a limitation during the period for which plaintiff could recover compensation. The period of limitation specified in section 156 of the Judicial Code is a limitation both on the right to institute suit and on the period prior to suit during which recovery may be had. In these circumstances and in view of the facts disclosed by the record, we would not be justified in assuming, in the absence of language clearly indicating such intent, that Congress intended only to waive the limitation on the right to institute a suit upon the patents and not to waive the limitation on the period for which recovery might be had. As shown above, the attention of the Congressional Committees which considered and recommended the passage of the jurisdictional act was called to the fact that Fauber had presented his claim for alleged unauthorized use of the patents as early as August 1917 and that the special jurisdictional act was not necessary in order to enable the administratrix to institute a suit in this court upon the patents since such patents did not expire until 1927 and 1929, respectively, but that any recovery on them could be had for uses occurring within a period of six years prior to the filing of the petition, and without a waiver of limitation any period for recovery would be relatively small. We are therefore of opinion, and so hold, that under the provisions of the jurisdictional act plaintiff is not limited in the right of recovery for such infringement as may be established to a period of six years prior to the filing of the original petition, and that she may recover any compensation to which she shows herself to be entitled for any use by the defendant of the Fauber inventions at any time during the life of the patents.

The next two questions, which will be considered together, are whether any or all of the four claims of the first patent in suit (finding 9) and the five claims of the second patent in suit (finding 14) are valid and, if so, whether any or all of such claims have been infringed by any or all of the alleged infringing structures of the defendant which are described and illustrated in findings 24 to 35. The question of accounting as to the amount of recovery, if any, is reserved until after the determination of the question of validity and infringement.

Both patents relate to the hull construction of what is known as "Hydroplane Boats". A hydroplane boat is defined as one which is so constructed as to receive support when in motion from the dynamic reaction of the water upon surfaces, technically referred to as "hydroplanes," the dynamic reaction of the water acting upon these surfaces to raise the hull partly

out of the water, thereby lessening the submerged area of the hull with a consequent reduction of skin resistance, thus causing the boat, more or less, to plane or travel on the surface of the water, thereby permitting a relative high speed in proportion to the propulsive effort. The principles of hydroplane construction disclosed in and forming the basis of the two Fauber patents in suit have been generally recognized by those skilled in the art as of considerable practical value in speed-boat construction and have been widely used in boat hull construction, and licenses have been granted under the patents.

The alleged infringing structures of the defendant described and illustrated in the findings above mentioned comprise and are limited to various forms of hull or pontoon construction utilized in seaplanes and flying boats, the various types of which alleged infringing structures are included in the generic term of "hydroairplane." A hydroplane consists of a hull or pontoon member or members associated with an airplane, and capable of maneuvering on the surface of water, taking off, flying, or maneuvering in the air and, subsequently, alighting on the surface of the water. While so maneuvering on the water the hull possesses all the characteristics and functions of a boat, and these characteristics and functions exist irrespective of the fact that the propulsive effort is obtained by means of an air propeller instead of a water propeller. In order to keep the length of the take-off run of a hydroplane to a minimum, one of the essential features of the hull construction thereof is that of readily and quickly obtaining a high speed in the water in proportion to the propulsive effort, and the hull construction must therefore be of an efficient type.

The first patent in suit, #971029, is described and illustrated in findings 7 to 11, inclusive. The structure to which this patent is directed is a hydroplane boat provided with a bottom formed of a plurality or a series of surfaces, or members, located at each side of the central or keel line. These members possess the dual function of forming the flotation surface of the bottom and act as hydroplanes, and they are arranged in stepped relation with each other. The rear of each hydroplane member or surface forms a set-back shoulder or step with respect to the adjacent forward end of the next succeeding member, and these hydroplane surfaces are inclined laterally and downwardly from the chine, or margins of the boat to the keel thereof so that in cross-sectional form the hydroplane members form a V-shaped section from chine to chine (side to side) of the boat. See illustrations, Figs. 1 to 5, finding 7. The hydroplane members are progressively deeper in the water from the bow to the stern, as measured at the water line when the hull is at rest and supported by flotation, and they are of concave V form in cross-section from chine to chine.

In Figs. 6 to 9 of this patent, the forward hydroplane members measured from the rest water line are shown as being progressively deeper in the water from the bow to a point just aft of the midsection of the boat, the after members being substantially all of the same depth. In the form disclosed in Figs. 6 to 9, all hydroplane members form a straight V-section from chine to chine of the boat. In both forms disclosed in Figs. 1 to 5 and 6 to 9, the boat has a pointed bow so that the width of the hydroplane members gradually increases from the bow to the widest part of the boat. When the boat starts from rest and its speed is gradually increased by means of the propeller at the stern, the hydroplane members function to divide and deflect the water against the next succeeding hydroplane member to the rear causing the boat to rise in the water, thus lessening its displacement. As the speed increases the displacement decreases and the boat automatically regulates its own depth to a degree of displacement according to the speed.

The claims of this patent which are in suit are directed to the lateral or crosswise inclination and the stepped relationship of a plurality of hydroplane surfaces, and such claims are not limited solely to boat construction as shown in the first embodiment of the patent (Figs. 1 to 5), which construction has the descending keel line throughout the entire length of the boat in contradistinction to the second embodiment (Figs. 6 to 9) in which the keel line only descends to a point somewhat aft of the center section of the hull.

The second patent, #1024682, relates in general to a hydroplane boat with a bottom formed of a plurality or a series of hydroplane surfaces or members located at each side of the central or keel line, which hydroplane surfaces are inclined latterally down toward the keel and form a

concave or hollow V-shaped cross-section from chine to chine, the surfaces from fore to aft being arranged in stepped relationship. In general, this patent relates to the same type of hull as is above set forth and disclosed in the first patent, which patent is specifically referred to by application in the second patent. The structure of the second patent differs from that of the first patent in two distinctive features which are—

(1) Each of the two hydroplane members is arranged at opposite sides of the center line of the bottom and inclines laterally and downwardly toward the center line, each of the hydroplane members having its angle of rearward inclination at said center line less than angle of rearward inclination at its outer lateral margin. In other words, the V-shape of each of the hydroplane surfaces is warped or twisted so that an individual hydroplane surface becomes flatter fore to aft; (2) with respect to any two hydroplane surfaces arranged one to the rear of the other, the hydroplane members of the rear hydroplane surface have a less degree of lateral or transverse inclination than the hydroplane members of the forward hydroplane surface; that is to say, each rear hydroplane surface has a flatter V form than the forward hydroplane surface. Figs. 1, 5 and 5a of this patent, which disclose these features, are reproduced in finding 13.

▆▆▆ Prior patents in the art covered by the two Fauber patents in suit, considered by or called to the attention of the Patent Office during the progress of Fauber's applications, are set forth as to the first patent in suit in finding 11, and as to the second patent in suit in finding 15. The prior art pertinent to the claims of the patents in suit is exemplified by the prior art patents and publications set forth in finding 17 and the disclosures of those prior patents and publications and the facts which are established by a consideration and study thereof in the light of the testimony of record are set forth in findings 18 to 23, inclusive, and no useful purpose would be served by a restatement here of the facts so established. These disclosures and the facts so found show that those skilled in the art of boat and hull construction were familiar with and had knowledge of hydroplane hull and boat construction, as found in the ultimate facts stated in finding 36. Upon these evidentiary and ultimate facts, we have found the further necessary ultimate facts as set forth in findings 37 to 42, inclusive, which, for reasons stated therein, establish that claims 1, 2, 5, and 6 of the first patent, #971029, in suit and claims 1, 2, and 29 of the second patent in suit, #1024682, are invalid; that claim 4 of the second patent is valid; that the terminology of this claim is applicable to the Government structures known as the Aeromarine Model 40, the HS Type Hull, and the NB-1 Float mentioned in finding 24; and that in the manufacture and use of those structures the defendant has infringed this claim of the patent; that claim 5 of the second patent is also valid but, by reason of the limitations therein, the terminology of this claim is not applicable to any of the alleged infringing structures of the defendant and the claim has not, therefore, been infringed.

The essential evidentiary facts established by the record, which we think establish infringement of claim 4 of the second patent, are shown by the typical illustrations in finding 24 of the HS Hull (Fig. 5), the Aeromarine Model 40 (Fig. 2) and the NB-1 float-form plane, #3863, and the facts found in findings 27 to 29, inclusive, and findings 31 to 33, and 34.

On the matter of infringement, counsel for defendant contend that each of defendant's structures has a straight athwartship shoulder located substantially in vertical line with the center of gravity to form a pivotal point for longitudinal oscillation of the airplane in respect thereto, and has its forebody extending forwardly and upwardly therefrom to the stern, the fore-afterbody extending rearwardly and upwardly therefrom the the stern, the forebody and the adjacent afterbody forming a longitudinal dihedral relationship; that this is an entirely different structure from the structure covered by any of the claims in suit; that it is the antithesis of a stepped-down descending keel-line relationship; that no matter what position the defendant's hulls may take in the water, the dihedral relationship remains between the forward body and its adjacent afterbody; that at no time does the afterbody form a stepped-down relationship with its forebody; that instead of gradually displacing or lessening the submerged area, under constant immersion of the stern, a sharp and abrupt separation of the afterbody, and also of the forebody, from the water is the dominant factor of defendant's hulls; that at no time can the structures covered by

any of the claims of the patents in suit assume a position corresponding to the above-mentioned dihedral relationship, since the patentee's structure requires immersion of the stern at all times, which stern at no time is ever disposed upwardly with respect to the horizontal; that since the step-down descending keel is essential to all the claims in suit, the complete absence of it in defendant's structures makes infringement impossible; that from the divergence in shape, resulting from the removal of the step-down descending keel relation, and the provision of the afterbody of defendant's hulls with an upward inclination with respect to the forebody preceding it, totally different modes of operation result; and that the individual functions of the patentee's paramount factor finds no counterpart or equivalent in any of defendant's hulls.

The defendant further contends that claim 4 of the second patent has other details of having two hydroplanes, of which the rearward hydroplane member is of less lateral inclination than the forward hydroplane member; that this relationship necessitates that the lower part of the rearward hydroplane is deeper in the water than the lower part of the forward hydroplane, otherwise the variation in angularity is meaningless; that the only disclosure in the patents is a series of nine hydroplanes in which each succeeding hydroplane has its rear end deeper in the water and blunter than the hydroplane preceding; that as none of the defendant's structures has the successive blunting of the angular sections working deeper in the water in the same manner as in the second patent, the defendant's structure in which a blunting of the succeeding angularity accidentally appears, but which inclines upwards and tapers in cross-sections to the stern, is totally different in substance from any claim of the second patent; that in those of defendant's structures in which the after portion of the hull has a slightly blunter transverse angularity than that of the forebody, this difference is so slight that no essential different action results therefrom; that the blunter angularity of the afterbody is offset from the forebody by the straight cross shoulder and the offset afterbody is inclined rearward upwardly from the straight cross notch to the stern, and its afterbody has its cross-sectional sections constantly decreasing towards the stern, the smallest section be-

ing at the stern; that the mere incident in the slight variation of transverse bluntness in certain of defendant's structures is of no consequence; that the blunter portion does not perform the same work as the blunter portion of the patented structure; that neither the means nor the result is the same, and that there is, in consequence, a total absence of infringement of claim 4 by these structures of the defendant. The substance and effect of defendant's contentions are that the afterbody of defendant's structures, hereinafter more fully discussed, is not a hydroplane surface so that consequently, there is not a plurality of hydroplane surfaces, and that the terms of any claim must be limited to the structure referred to in the illustrated disclosures and can cover nothing but what is specifically shown. We think these contentions misinterpret the patents and also overlook certain other important considerations.

Claim 4 of the second patent now under consideration is as follows: "A hydroplane boat provided with two hydroplanes arranged one at the rear of the other, and in stepped relation and having their bottom surfaces at their forward ends continuous with the flotation surface of the hull, said hydroplanes each consisting of two hydroplane members arranged at opposite sides of the center line of the bottom and inclined laterally and downwardly toward said center line; the said hydroplane members of the rearmost hydroplane having a less degree of lateral inclination than the hydroplane members of the forward hydroplane."

The definition of the term "hydroplane boat" used in the patent is not to be determined solely from the illustrated disclosures of the patents, which show no wings—but do not exclude them. It is well understood that hydroplane boats may, or may not, be provided with wings. When on the water, a hydroplane boat with or without wings necessarily has some part immersed and the extent of this part can be determined, if desired, by the use of a horizontal water rudder or by an air elevator. In Smith v. Snow, et al., 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721, the court said: "We may take it that, as the statute requires, the specifications just detailed show a way of using the inventor's method, and that he conceived that particular way described was the best one. But he is not confined to that particular mode

of use, since the claims of the patent, not its specifications, measure the invention. *Paper Bag Patent Case*, 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122; *McCarty v. Lehigh Valley R. Co.*, 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358; *Winans v. Denmead*, 15 How. 330, 343, 14 L.Ed. 717."

The patent shows stepped hydroplane members which are downwardly inclined toward the keel line, and which are downwardly inclined from front to rear. Claim 4, now under consideration, specifically recites the downward inclination toward the keel line, but contains no limitation at all as to fore and aft disposition. All that the claim requires is that there be two or more hydroplane surfaces of the V section in stepped relation. The record conclusively shows that the defendant's structures which we have found to infringe this claim have the required plurality of hydroplane surfaces, and that the after-surface during taxiing has a hydroplaning action even when this after-surface is at a negative angle and that during the take-off run of the hydroairplane, when this after-surface assumes a positive angle, as it necessarily does, it is downwardly and rearwardly inclined. See findings 27, 28, and 29 and the illustrations, in finding 27, showing the three positions described therein of a conventional seaplane during the take-off run. In addition to the facts stated in the findings mentioned, and the illustrations there shown, there is produced below for the purpose of further discussion two illustrations designated exhibit 7 and exhibit 24 which will hereinafter be referred to as the ABC form.

The three illustrations reproduced in finding 27 show a seaplane with a hull of the type of the ABC form found to infringe Claim 4. When the speed of an engine is increased preparatory to taking off, the airplane goes through what is known as the taxiing stage, which brings the machine from "the idling position," shown in the first illustration (finding 27) to the position of "running on the step" shown in the third illustration of finding 27. During taxiing the after-portion of the float, designated C in exhibits 7 and 24 above, goes down to the position shown in the second illustration (finding 27) termed "maximum nose-up" position. As the speed is increased, several factors, including the hydroplaning action on the after-surface C, hereinafter more fully discussed, cause the float to come up until it eventually attains the "running on the step" position wherein only the after-portion of the forward hydroplaning surface A is actually in the water. When this position has been attained, the operator ordinarily manipulates the longitudinal controls of the airplane in a manner to increase the angle of incidence of the wings, without, however, again submerging the after-surface C, and the airplane then takes off. It will be noted from the "maximum nose-up" position shown in the second illustration (finding 27) that the after-surface C is downwardly and rearwardly inclined at what the evidence shows, without dispute, is a positive angle. While the testimony of both parties is in agreement that the after-surface C of the hydroairplane hull is a "hydroplaning surface" when it is in this positive angle, there is a conflict in the testimony with reference to whether this after-surface C is in a hydroplaning attitude and acts as a hydroplaning surface when the plane is in the "running on the step" position, as shown in the third illustration (finding 27), but we are of opinion from a study of the entire record that the greater weight of evidence establishes that even with the after-surface C at a negative angle, i. e., upwardly and rearwardly during taxiing, it, nevertheless, acts during that time as a hydroplaning surface.

The ABC illustration, exhibit 24 above, demonstrates the correctness of this view, that the after-surface C, being in contact with the surface of the water and receiving hydrodynamic action therefrom, is a hydroplane surface, and the evidence establishes the fact that during taxiing the after-surface C acts as a hydroplaning surface even when it is at a negative angle to the horizontal, as shown by the illustration ABC—exhibit 24. The flow of the water leaving the step strikes surface C with a lift component, as designated by arrows at "W". This is admitted by defendant's ex-

pert who termed this action of the water as an "inverted waterfall." He said: "In the meantime, the step-action is coming into play and the water no longer flows close around the step, but flows as an inverted waterfall, making contact on the after bottom, further and further aft as planing is developed."

This expert further admitted that this flow of water and its action on the after-surface C, even while that surface was at a negative angle, would have a lifting effect.

In view of the facts set forth in the findings and for the reasons above stated, we think defendant's infringement of claim 4 is clear for the reason that the after-surface C of the defendant's hulls is a hydroplaning surface and falls within claim 4 of the patent which is of a scope sufficient to cover a construction in which is found two hydroplane surfaces in tandem and in stepped relation to one another. The fact that the forward surface A of the defendant's hull construction is a hydroplane surface has not been controverted and the testimony establishes that the after-surface of defendant's hull construction contributes a hydroplaning action. Whether or not Fauber recognized that his hydroplane boat was utilizable as an adjunct to the flying machine is of no moment. In Kennicott Co. v. Holt Ice & Cold Storage Co., 7 Cir., 230 F. 157, 160, the court said: "Some utility is to be presumed from the grant; other uses and advantages need not be enumerated; even if unknown to the inventor the additional and the new uses are within the patent; and they may properly be considered in determining the status of the invention in the art."

In Larson v. Crowther, 8 Cir., 26 F.2d 780, 787, the court held that "An inventor is entitled to all the uses to which his invention may be put, even if he is not aware of such uses when he secures his patent."

In this case the court, 26 F.2d at page 788, quoted from Minneapolis, St. P. & S. S. M. R. Co. et al. v. Barnett & Record Co., 8 Cir., 257 F. 302, 312, as follows: Moreover, even if this want of perception of the benefits of his invention existed, it would not be fatal to his patent, for, when one has plainly described and claimed his improvements or combinations, and secured a patent for them, he has the right to every use to which they can be applied, and to every way in which they can be utilized to perform their function, whether or not he was aware of all these uses and methods of use when he claimed and secured his monopoly."

In B. G. Corporation v. Walter Kidde & Co., Inc., 2 Cir., 79 F.2d 20, 22, the court said: "It is true that Paulson did not foresee the particular adaptability of his plug to the airplane; indeed, we may assume that he did not even know the especial needs of its engine. * * * he is not charged with a prophetic understanding of the entire field of its usefulness."

■■■■ The defendant may have made modifications as to specific form of the hull, but since it has retained the Fauber principle in its hull designs infringement is present for the reason stated by the court in Norton et al. v. Jensen et al., 9 Cir., 49 F. 859, 866: "* * * If the patentee's ideas are found in the construction and arrangement of the subsequent device, no matter what may be its form, shape, or appearance, the parties making or using it are deemed appropriators of the patented invention, and are infringers."

■■■■ The addition by the defendant to the hydroplane boat covered by the patent of the aeroplane superstructure does not affect the ultimate question of infringement, for, as was held by the court in Cimiotti Unhairing Co. et al. v. American Unhairing Mach. Co., 2 Cir., 115 F. 498, 504: "* * * The mere fact that there is an addition, or the mere fact that there is an omission, does not enable you to take the substance of the plaintiff's patent. The question is not whether the addition is material or whether the omission is material, but whether what has been taken is the substance of the invention."

■■■■ While it may be that in taxiing to the take-off, efficient operation of the hydroplane requires that the defendant's hulls rock forward to the "on the step" position, this is merely a matter of mode of operation and, as was said in Auditorium Ventilating Corp. v. Greater Rochester Properties, Inc., D.C., 59 F.2d 450, 457: "The claims in controversy are not specifically limited to details of operation."

In Wright Co. v. Herring-Curtiss Co. et al., 2 Cir., 211 F. 654, 655, the court pointed out that "* * * a machine that infringes part of the time is an infringement, although it may at other times be so operated as not to infringe."

The judgment of the court is that claim 4 of the second patent is valid and that it

has been infringed, and that plaintiff is entitled to recover, but entry of judgment will be withheld until the taking of evidence on accounting, showing the amount of compensation due, has been completed. It is so ordered.

WHALEY, Chief Justice, and GREEN, Judge, concur.

WHITAKER, Judge, took no part in the decision of this case.