**BLUMCRAFT OF PITTSBURGH, a Partnership consisting of Hyman Blum, Max Blum, Louis Blum and Harry P. Blum, Plaintiff,**

v.

**CITIZENS AND SOUTHERN NATIONAL BANK OF SOUTH CAROLINA, Daniel Construction Company, Inc., and Colonial Iron Works, Inc., Defendants.**

**Civ. A. No. 4163.**

United States District Court
D. South Carolina,
Greenville Division.
May 23, 1968.

Ralph Bailey, Jr., Greenville, S. C., James C. McConnon, and Henry N. Paul, Jr., Philadelphia, Pa., for plaintiff.

Donald L. Ferguson and W. Francis Marion, Greenville, S. C., and Warren N. Williams and Gordon D. Schmidt, Kansas City, Mo., for defendants.

## ORDER

SIMONS, District Judge.

Plaintiff, Blumcraft of Pittsburgh, a partnership, manufactures architectural metal products such as railing components. This action was brought against defendants under the patent laws of the United States for alleged infringement of U. S. Patents No. D–171,963 [1] dated April 20, 1954, and No. 2,905,445 [2] dated September 22, 1959, both relating to a railing structure, although to two different railings. Defendants denied infringement and counterclaimed for a judgment that both patents are invalid and not infringed.

Defendant Citizens and Southern National Bank of South Carolina, (C & S), is a corporation doing banking business in South Carolina and has a branch in Greenville. Defendant Daniel Construction Company (Daniel), a corporation having a place of business in Greenville, is a large general contractor. Defendant Colonial Iron Works, Inc., (Colonial), is a corporation having its principal place of business in Columbia where it does subcontracting and fabricating in the miscellaneous iron field.

The railing structure alleged to infringe the two patents in suit was fabricated by Colonial and erected by Daniel in the bank building of C & S in Greenville. The railing components identified as "Clean Line" rail parts were manufactured by and purchased from Architectural Art Mfg., Inc., of Wichita, Kansas. Architectural Arts has controlled and conducted the defense of this suit, but is not a party to this action for the reasons stated in this court's previous order.[3]

Plaintiff's complaint alleges that the defendant, C & S, has been and still is infringing these patents by using ornamental rails embodying each of the patented inventions and that the defendant, Daniel, has infringed these patents by making, selling and using the ornamental rails embodying the patented inventions, and further alleges that the defendants jointly infringed these patents by making, selling and/or using ornamental rails embodying the patented inventions.

Plaintiff further alleges that the aforesaid infringement was done wilfully and deliberately with the intention to deprive the plaintiff of its rights with respect to the patented inventions. Plaintiff was by order filed June 21, 1966, allowed to amend its complaint so as to add Colonial as a party-defendant.

---

1. See copy of plaintiff's Ex. 18 appended hereto and marked "Schedule A".

2. See copy of plaintiff's Ex. 101 appended hereto and marked "Schedule B".

3. Blumcraft of Pittsburgh v. Citizens & Southern National Bank of S. C., 255 F.Supp. 441 (D.S.C.1966). However, during oral argument after trial, Warren Williams, counsel for defendants and Architectural Art Mfg. Co., Inc., advised the court that his client, Architectural Arts, would indemnify and save harmless the defendants herein from any losses sustained by them as a result of this litigation, even though there was no formal indemnity agreement before trial.

Defendants' answer in substance denies that the plaintiff's patents are valid, and further denies any infringement. Defendants further ask by way of counterclaim for a declaratory judgment that both the design and mechanical patents be declared invalid and void, and that the defendants do not and have not infringed or threatened to infringe any of the claims of the patents in suit.

By reply plaintiff alleges that the patents are valid and that the counterclaim fails to state a claim upon which relief can be granted, and further that the counterclaim states no issue other than those dealt with in the complaint and answer.

This suit is brought under the provisions of 35 U.S.C.A. § 271 et seq.,[4] alleging infringement by the defendants of the invention of a design patent and a mechanical patent.

The defendants' contention that the patent is invalid is based on 35 U.S.C.A. § 102[5] and 35 U.S.C.A. § 103.[6] Plain-

4. 35 U.S.C.A. § 271, provides as follows:
   "(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.
   "(b) Whoever actively induces infringement of a patent shall be liable as an infringer.
   "(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.
   "(d) No patent owner otherwise entitled to relief for infringement or contribuory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

5. 35 U.S.C.A. § 102, provides as follows:
   "A person shall be entitled to a patent unless—
   "(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country,
   before the invention thereof by the applicant for patent, or
   "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
   "(c) he has abandoned the invention, or
   "(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or
   "(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or
   "(f) he did not himself invent the subject matter sought to be patented, or
   "(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention that shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

6. 35 U.S.C.A. § 103, provides as follows:
   "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art

tiff's complaint was filed September 27, 1962, and the case was heard without a jury at Greenville, South Carolina on May 17, 1967. There are essentially four issues: (1) The validity of U. S. Patent No. D–171,963; (2) the validity of U. S. Patent No. 2,905,445; (3) the infringement by defendants of U. S. Patent No. D–171,963; and (4) the infringement of U. S. Patent No. 2,905,445.

Plaintiff has submitted photographs and drawings of railings installed by the defendants at the Citizens and Southern National Bank building in Greenville, South Carolina, together with various other exhibits, in support of its contentions. The defendants have likewise submitted numerous exhibits, drawings and photographs.

## FINDINGS OF FACT

The plaintiff is a partnership consisting of Hyman Blum, Max Blum, Louis Blum and Harry P. Blum, all of whom are citizens of the United States and residents of Pittsburgh, Pennsylvania. The firm has its principal place of business at 460 Melwood Street, Pittsburgh, Pennsylvania 15213.

The defendants, C & S, Daniel, and Colonial, are corporations having places of business within the District of South Carolina. The acts complained of by the plaintiff occurred within the District of South Carolina.

There is no issue as to jurisdiction since this action arises under the patent laws of the United States and jurisdiction is conferred by 35 U.S.C.A. § 281 and 28 U.S.C.A. § 1338 as to plaintiff's complaint, and 28 U.S.C.A. §§ 2201 and 2202 as to defendants' counterclaim. Venue is based upon 28 U.S.C.A. § 1400.

In 1958 Lockwood-Greene Engineers, Inc., an architectural and engineering firm having offices in Spartanburg, South Carolina, was retained by C & S to design a new bank facility for construction in Greenville, South Carolina. Lewis S. Booth who testified for the defendants in the trial was in charge of the design of the bank building. The building was constructed by Daniel during 1960 in accordance with specifications and drawings issued by Lockwood-Greene. The specifications called for Blumcraft rails to be used throughout the building with the exception of one overlook rail which was to be a welded galvanized pipe and wire mesh. With the exception of the overlook rail, the specifications of Lockwood-Greene provided that "all descriptions in this specification and details shown on the plans are based on design and catalog numbers that appear in the catalog of Blumcraft of Pittsburgh, Pennsylvania for the purpose of quality and design control. Other manufacturers' items similar in design and quality, in the opinion of the architect, will be considered for substitution in lieu of that specified in details in the drawings."

All of the rails except the one for the balcony were specified to be of the "in line" type wherein the handrails and intermediate rails were in substantially the same vertical plane as the supporting posts. The balcony railing was specified to be of the "offset" type with the handrails and intermediate rails located to one side of a vertical plane composed of the supporting posts, and with the "offset" rails carried on the post by brackets secured to the post. Colonial bid on the miscellaneous iron for the bank building which included the handrails and was awarded the subcontract by Daniel. After the award of the subcontract to Colonial and during construction of the bank building, C & S, the owner, asked the contractor Daniel to take steps to reduce the overall cost of the project. Colonial was asked to reduce the miscellaneous iron cost, if possible; and the use of Architectural Art Mfg., Inc.'s "clean line"

are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

handrails was suggested in lieu of the specified rails of Blumcraft referred to in the specifications. Lockwood-Greene approved the substitution of the Architectural Arts "clean line" handrails on the main staircase "c" of the bank building. Daniel later obtained approval of Lockwood-Greene to use Architectural Arts "clean line" handrails on the patio overlook as a substitute for the welded pipe and wire mesh railing in the original specifications. Neither Daniel nor Colonial requested any change in connection with the Blumcraft hand railing originally specified for the patio balcony railing.

Neither the handrail shown and described in Patents No. D–171,963, nor No. 2,905,445 was specified in the original specifications of the Citizens and Southern National Bank building in Greenville, and no bid based on such rail was ever made by Colonial in connection with such building. The railings were composed of parts manufactured by Architectural Arts Manufacturing Company of Witchita, Kansas. They were purchased from defendant Colonial, installed by the defendant Daniel, and have been used by the defendant C & S in its Greenville building. The patents in suit had been issued and were in effect during the period of construction, and continue to be valid unless proved invalid by the defendants in the present suit.

The defendants contend that both patents are invalid due to the state of the prior art, and that the patents were obvious, which in itself invalidate the patents.

There was a vast change in architecture to the modern or contemporary style following the turn of the century and there existed a need for railings compatible with the modern design and made up of standard component parts, which could be made available from stock and readily adapted by an architect to suit the exigencies of a particular building structure.

Many railings were designed on a job-by-job basis, and many persons attempted to produce something harmonious or compatible with the modern design of buildings. Despite much effort this need persisted and no railing manufacturers were offering for sale a commercially usable railing system in which a plurality of handrails are disposed away from the supporting post, producing a "floating" visual effect.

Louis Blum, a partner in the Blumcraft firm, in 1952 conceived the railing design in suit to be used as a stairway railing in a private residence. He spent two months working on the design, made rough sketches, had a model built, and employed a patent attorney in development and procurement of the patent; he was granted the design patent (D–171, 963) April 20, 1954.

Mr. Blum testified that he wanted "to develop an original railing and something that should be novel, and I came up with something to avoid having always having a handrail directly over the post and the same with any other members below, so I arrived at this floating system in which the posts are in one plane, and the other handrail group of members would be in another plane, and give the illusion of separation between the two planes, group of handrails, and between the posts." (Tr. 13). It is apparent that he went to considerable expense in developing the design and securing the patent.

The design by Louis Blum of the design patent in suit satisfied the need which had developed in the art over the years. The design patent (No. D–171,963) depicts a number of vertically spaced, horizontal railings supported by a plurality of horizontally spaced, vertical posts. The rails appear to have a clean sweep of continuous uninterrupted lines, separate from the upright units, and so arranged in relation to such upright units as to present the effect of floating in space. More particularly it is described as follows:

a. A plurality of spaced parallel posts generally rectangular in cross section

and arranged so as to present a series of spaced parallel vertical surfaces;

b. A plurality of spaced parallel hand rails generally flat or rectangular in cross section and arranged in the same vertical plane so as to present a series of parallel horizontal surfaces;

c. Connecting brackets attaching the underside of each handrail to the adjacent edge of each post, each bracket comprising a rod-like member extending at right angles to the post and a substantially flat triangular member extending upward from the rod-like member to the center of the underside of each rail leaving the rail unobstructed throughout the hand-gripping portion thereof;

d. The aforesaid elements so designed and arranged as to cause the handrails to appear to float in space away from the posts.

Prior to 1952 the Blumcraft firm did only custom built work. After the new design it relinquished custom built work and sold parts to all fabricators. The Blumcraft railing achieved remarkable success in the trade. The railing was described as having a classical lasting design.

Dr. Henry L. Kamphoefner, architect and Dean of the School of Design at North Carolina State University and expert witness for plaintiff, stated that prior to 1952 most of the railings were designed by the architects and it was not until the Blumcraft patent that a prefab railing came into existence. He also stated that Sweet's Catalog is an outstanding publication for architects, and that no design railings shown in Sweet's Catalog which were comparable to the modern design of buildings were available before the Blumcraft railings. He listed the features of the design patent No. D–171,963 as: (1) A series of parallel surfaces; (2) parallel horizontal surfaces contrasted by a series of vertical posts; (3) mechanical features or fasteners that connect rails to posts; (4) the

visual impression created, which is comparable to modern design, and which gives a "floating in space" effect to the horizontal railings which are offset from the vertical posts and have small connections that are unobvious and not easily seen. The prior art at the time of the design patent was limited to railings directly mounted on the supporting posts or single handrails mounted offset from the supporting posts or a wall.

The design patent in suit, No. D–171,963, was previously involved in litigation in the Court of Claims.[7] In that case the patent was found valid and infringed. The accused railing in the Court of Claims case was a different railing from the accused railings here, but nevertheless was quite similar as is shown by Plaintiff's Exhibits 15, PX–39 and PX–112.

Following the development of his railing design, Louis Blum developed in 1955 a mechanism for mounting an ornamental handrail in spaced relation to an ornamental post, at the same time providing ornamentation and structural rigidity. This mechanism was developed commercially by plaintiff and put on sale in 1956. This mechanical patent, No. 2,905,445, was granted to him September 22, 1959. Architectural Arts purchased prior to 1959 some $15,000 worth of tube line railing from plaintiff. Total purchases for all railings were in excess of $30,000. Plaintiff in the summer of 1959 saw the catalog of Architectural Arts and learned of the accused railings and also saw in The South Carolina Magazine of Architecture a picture of the accused railing in the Citizens and Southern Bank building at Greenville.

DISCUSSION OF ISSUE NO. I—
VALIDITY OF DESIGN PATENT
NO. D–171,963

■ A patent is presumed to be valid and the burden of proof is upon the one attempting to establish its invalidity. 35 U.S.C.A. § 282.

7. Blumcraft of Pittsburgh v. United States, 372 F.2d 1014, 178 Ct.Cl. 798 (1967).

The defendants in attacking the validity of the design patent in suit rely on numerous publications showing various railings and railing components as follows:

(1) Arch. Record, April 1933, pp. 235, 267, 269 (DX–94a, b, c)

(2) Arch. Record, July 1934, Title Page, pp. 5, 19 (DX–95a, b, c)

(3) Arch. Forum, March 1937, Title Page, pp. 219, 222 (DX–96a, b, c)

(4) Arch. Record, Oct. 1938, pp. 5, 39, 46 (DX–97a, b, c)

(5) Arch. Record, March 1940, pp. 5, 143 (DX–98a, b)

(6) Arch. Record, August 1940, pp. 5, 65, 68 (DX–99a, b, c)

(7) Arch. Record, Sept. 1941, Title Page, pp. 41, 45 (DX–100a, b, c)

(8) Arch. Forum, Oct. 1942, Title Page, pp. 35, 43 (DX–101a, b, c)

(9) Arch. Record, Nov. 1945, pp. 5, 60 (DX–102a, b)

(10) Sweet's Catalog Service 1950, Sec. $\frac{6e}{5}$, p. 3 (DX–103d)

(11) Arch. Forum, July 1950, Title Page, p. 75 (DX–104a, b)

(12) Sweet's Catalog Service 1952, Sec. $\frac{6c}{RE}$, p. 14 (DX–105d)

(13) Arch. Record, July 1952, Cover Page, Title Page pp. 149, 163 (DX–106a, b, c, d)

(14) Arch. Detailing 1952, p. 166 (DX–113a, b)

(15) Sweet's Arch. 1952, Sec. $\frac{6e}{HA}$, p. 7 (DX–116a)

(16) Sweet's Arch. 1952, Sec. $\frac{6e}{BL}$, p. 3 (DX–116b)

Public Use, Hollaender Mfg. Co. (DX–21 through DX–80)

———◆———

In addition to the publications set forth above, defendants rely upon an alleged prior use, the subject matter being a railing forming part of the main stairway of the Home Federal Savings and Loan Building on State Street in Chicago, Illinois. Defendants also allege that the design was obvious. If there were either a prior use, or the design were obvious, the patent in question would be invalid.

It is true that rails have been offset from supporting members or posts in prior use, and that some railings have had multiple parallel rails. However, there was nothing in the art at that time which gave the effect of the plurality of spaced parallel handrails and a plurality of vertical planes, as does plaintiff's rail. None of the exhibits relied on by the defendants as prior art have the distinctive features of the Blum design. In fact considerable thought and a substantial redesign of the cited exhibits by the defendants would be necessary in order to achieve the design having the distinctive features of the Blum design.

■ Obviousness, as stated earlier, would also invalidate the patent. But only through hindsight does the design appear obvious, which of course is not the test. In applying the test of invention over prior art, we must bear in mind that hindsight is more revealing than foresight. Preformed Line Products Co. v. Fanner Mfg. Co., 328 F.2d 265, 271 (6th Cir. 1964), cert. den'd. 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51. There being no reason for the lower railings to be offset the design becomes more un-

obvious. Defendants' expert witness, Mr. Fishleigh, testified that plaintiff's design was contrary to the normal design in railings. He said "it is contrary to what I would want any way. In other words, if I want a railing, I don't want one which is floating loose, kicking around; I want one which in my instance would give some degree of or indication of rigidity, that if I thought I got ahold of it, it would hold me." The plaintiff's design is even more unusual in view of the normal expectation that a rail would and should appear very stable. Plaintiff's design is quite contrary to this in that it produces a floating effect, as opposed to an appearance giving stability.

▇ Mr. Fishleigh further testified that no one example of the prior art "anticipated" the design patent, but that it was necessary to combine earlier references to anticipate the design patent. But separate presence in the prior art of each element of combination will not prevent a finding of invention. Wham-O-Mfg. Co. v. Paradise Mfg. Co., 327 F.2d 748 (9th Cir. 1964).

▇ As stated by the court in Try-Me Beverage and Compound Co. v. Metropole, 25 F.2d 138 at 139 (E.D.S.C. 1928):

"It is not necessary for a design patent that all the elements of the design be new; it is essential that the elements, whether new or old, be grouped or combined in such a manner as to produce a pleasing appearance, different from what has preceded it. The fact that the elements of a design patent were old does not establish want of invention in assembling them. The decisive question is whether or not the design imparts a pleasing impression to the eye of ordinary observers." (Citations omitted.)

Recognizing that it was not new to provide an offsetting handrail from the supporting structures, nevertheless, it was new to offset all the rails in this particular manner so as to minimize the connection between the railings and the posts, thus giving the floating effect.

The entire record in the Court of Claims case was offered in evidence by the plaintiff in this case [8] and plaintiff contends that such decision is *res judicata* as to the validity of the design patent.

The court, however, need not decide whether the Court of Claims case is *res judicata* as to the validity although such decision was persuasive, for this court has reached its own independent determination that the plaintiff's design patent is valid.

▇ The presumption of validity,[9] the prior judicial determination [10] and the

8. Note 7, supra.

9. 35 U.S.C.A. § 282 provides as follows:
"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it.
"The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:
"(1) Noninfringement, absence of liability for infringement or unforceability,
"(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,
"(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,
"(4) Any other fact or act made a defense by this title.

"In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or, except in actions in the United States Court of Claims, as showing the state or the art, and the name and address of ı y person who may be relied upon as the prior inventor or as having prior knowledge of or having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires."

10. Note 7, supra.

commercial success [11] achieved by the plaintiff overcome any doubt as to the validity of the design patent. Robertson Rock Bit Co. v. Hughes Tool Co., 176 F.2d 783 (5th Cir. 1949), cert. den'd, 338 U.S. 948, 70 S.Ct. 487, 94 L.Ed. 585. Inasmuch as defendants have failed to sustain their burden of proving that the design would have been obvious at the time it was made to one having ordinary skill in the art, or that there was a prior use, the court finds the design patent valid.

### DISCUSSION OF ISSUE NO. II— INFRINGEMENT OF DESIGN PATENT D–171,963

■■ Having found the design patent valid the next question is whether the defendants have infringed it. In determining whether an accused structure infringes a patent, the rule of reason must prevail and the real test is whether in substance the defendant has used the inventor's idea as embodied in the inventor's structure. Trenton Industries v. A. E. Peterson Mfg. Co., 165 F.Supp. 523 (S.D.Cal.1958). The test of infringement in design patent cases may be stated as follows: If, in the eye of an ordinary observer giving such attention as a purchaser usually gives, the two designs are substantially the same and the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the patented design is infringed by the other; Gorham Co. v. White, 81 U.S. 511, 20 L.Ed. 731 (1871); R. M. Palmer Co. v. Luden's, Inc., 128 F.Supp. 672, 236 F.2d 496 (3rd Cir. 1956); Sanson Hosiery Mills v. Warren Knitting Mills, 202 F.2d 395 (3rd Cir. 1953).

Defendants claim those who purchase railing systems for buildings or designate the ones to be purchased, such as architects, give considerable study to the photographic representations, elevational views of the overall railing and parts thereof, and sectional views available in the manufacturers' and suppliers' catalogs and brochures before selecting any particular railing system, and give particular attention to the design details since these contribute to and distinctly affect the overall appearance of the railing. While this is true architects are not the only ordinary purchasers of railings. In fact an ordinary man on the street may choose which railing or design he might perfer in his building or home. Aside from this, the fact that defendants' own witness was unable to tell whether the illustration in the C & S Bank drawings was a Blumcraft or Architectural Art railing is certainly evidence that even one skilled in the art may be confused between the two.

Defendants' witness Louis P. Booth, in explaining why the Blumcraft railing was not installed and why the accused railing was substituted therefor, stated that the contractor of the building asked that another company's handrail be considered for several reasons, including availability, cost and design. The proposed rails had five parallel rails and the substitute had three rails. Other testimony also reveals that one of the reasons given for the substitution was that of economy, i. e. the substituted rails were less expensive. Among others, this of course is one of the basic reasons for our patent laws. When an individual expends time, money, and patience in the development of a new invention, he has gone to considerable expense. It is only fair that he be granted a patent so that he may recoup some or all of his expense, and enjoy the benefits that he may derive from his invention. Otherwise, an infringer could merely copy an article without expending time, research or resources to develop an invention, and still reap the same benefits.

The fact that Blumcraft of Pittsburgh railings were specified in the plans is of no particular significance since in this case and in most cases it is usually stated that the products of other manufacturers may be used in lieu of those specified

11. Glen Raven Knitting Mills v. Sanson Hosiery Mills, 189 P.2d 845 (4th Cir. 1951).

which are similar in quality and design in the opinion of the architect.

The defendants' witness Booth enumerated some of the differences in the two railings as follows:

"A. The first thing that strikes my attention is that in the cross-section shape of the vertical supports, the patent drawing is definitely rectangular in shape, whereas the photograph is square. The vertical shape of the drawing in patent is much more stressed than in the photograph because of the interruption of the photograph of the brackets, which hold the hand rails. The shape of the hand rail is considerably different. That in the photograph being a much stronger, architecturally, than the soft oval form of the drawing. The termination of the flared rails of the three members in the photograph is entirely different from the drawing which has termination of the top rail in a vertical extension to the floor, and the horizontal rails are cut directly. The shape of the brackets is different in that the photograph has a conical-horizontal member, whereas the drawing appears to be cylindrical in shape. The attachment to the stair in the photograph is an exposed bracket, and in the drawing it would be a concealed insert into the side of the stair. The top of the posts in the photograph is a truncated pyramid, and is higher in relation to your top rail, whereas in the drawing it is curved and ends directly at the top bracket attachment. I believe that. * * * "

He stated that in his opinion the accused railing could be distinguished from the patented railing. The court agrees with him. They can be distinguished upon examination by attempting to so distinguish them; however, changes in detail so as to distinguish them will not prevent an infringement.

■ The defendants in distinguishing the accused structure from the design patent listed numerous other differences, none of which were substantial. After

the defendant in Try-Me Beverage & Compound Co. v. Metropole, supra, pointed out numerous differences in the design on that case, the court said:

"It is not necessary to decide whether or not the above dissimilarities may on close inspection be found in the two designs. The test of infringement is not whether dissimilarities between two designs may or not be found. The courts hold, on the question of infringement, that if, in the eye of an ordinary observer, two designs are substantially similar, and if the resemblance is such as to deceive an observer, the first design patented may be held to be infringed by the other."

■ The essence of a design patent resides in the appearance of the design as a whole, not in the elements individually or in their method of arrangement. 69 C.J.S. Patents § 71. The United States Supreme Court in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, at page 607, 70 S.Ct. 854, at page 856, 94 L.Ed. 1097 (1950) stated:

"[T]o permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to make the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than dis-

closure of inventions, which is one of the primary purposes of the patent system."

■ It is the overall impression to the ordinary observer giving such attention as a purchaser usually gives that is important. Gorham v. White, 81 U.S. 511, 20 L.Ed. 731 (1871); Nebel Knitting Co. v. Sanson Hosiery Mills, 214 F.2d 781, 783 (4th Cir. 1954).

Defendants' witness Booth testified in a deposition in 1963 that the railing in the balcony before the window overlooking the patio and the railing around the patio overlook should be "uniform" in appearance. At the trial he said they should be "compatable", but would not object to the word "uniform" as he had used in his deposition. His use of the word "uniform" indicates that he himself considers that there is no substantial distinction or difference between the two railings.

It appears from the evidence that defendants purchased the patented rails and made certain changes but essentially have manufactured the same railing.

■ No evidence was offered by the defendants to show any independent origin of the accused railing system produced by Architectural Art Manufacturing Company after the plaintiff in its presentation had shown opportunity and inclination of the defendants to copy the patented railings in question. Here access and similarity is strong evidence of copying the same as access and similarity is strong evidence of copying in a copyright case. Bradbury v. Columbia Broadcasting System, Inc., 287 F.2d 478 (9th Cir. 1961).

As stated earlier, the entire record in the Court of Claims case was offered in evidence by the plaintiff in this case.[12] The accused railings in the present case are substantially the same in design as the accused railings in the Court of Claims case. (PX–15, PX–39, PX–112). The accused railings in the present case embody each of the distinctive features held by the Court of Claims to characterize the Blum design patent in the Court of Claims case.

■ The distinctive features of both the plaintiff's and defendants' railings produce the same overall effect, producing a clean uninterrupted sweep of parallel rail surfaces giving the impression that the surfaces float away in space from the posts to which they are connected by the minimization of the connecting factors. Upon detailed inspection of each in a side-by-side comparison differences are apparent, but mere differences in detail have not changed the overall effect so as to amount to a different design from the patent in suit.

The court finds the accused railing substantially similar to plaintiff's design patent, and accordingly finds the design patent infringed.

### DISCUSSION OF ISSUE NO. III— VALIDITY OF MECHANICAL PATENT NO. 2,905,445

The mechanical patent in suit (No. 2,905,445) is characterized by a clamping connector for connecting an ornamental handrail in spaced relation to an ornamental post, comprising separate v-shaped clamping means which receive and clamp the dovetail-shaped base portion of the handrail. More particularly the distinctive features of the Blum mechanical patent in suit, as set forth in Claims 1 and 3 of the patent, are as follows:

"1. In an ornamental rail structure, ornamental post means, ornamental rail means having a dovetail shape based portion and an upper hand-gripping portion, separate V-shape clamping means in juxtaposition forming a dovetail shape recess receiving and clamping the dovetail shape base portion of said rail means and exposing the upper portion of said rail means for hand-gripping, connecting means rigidly connecting said clamping means and said rail means in spaced relation to said post means and threaded bolt

12. Note 8, supra.

means passing through said clamping means forcing and retaining said clamping means together.

"3. In an ornamental rail structure, ornamental post means, ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion, means connecting said rail means in spaced angular relation to said post means comprising a pair of separate clamping members, the first of said clamping members being rigidly affixed to said post means and extending outwardly therefrom, the second of said clamping members being connected to said first clamping member by threaded bolt means, said clamping members having complementary V-shape portions forming a dovetail recess receiving the dovetail shape portion of said rail means and exposing the upper portion of said rail means for hand-gripping."

On the issue of the validity of the mechanical patent in suit, defendants rely upon 22 different patents and publications showing various structures as follows:

(1) Pat. No. D– 173,299 (DX–83)—(Blum)
(2) Pat. No.     1,864,160 (DX–84)—(Williams)
(3)  "    "         163,996 (DX–85)—(Hardy)
(4)  "    "         837,769 (DX–86)—(Allen)
(5)  "    "       1,165,193 (DX–87)—(McNeil)—Sometimes referred to as 1,165,195.
(6) Pat. No.     1,569,060 (DX–88)—(Wright)
(7)  "    " Re     17,629 (DX–89)—(Wehr)
(8)  "    "       2,056,842 (DX–90)—(Edgecomb)
(9)  "    "       2,427,723 (DX–91)—(Hawkins)
(10)  "    "      2,654,579 (DX–92)—(Cremens)
(11)  "    " D– 171,963 (DX–93)—(Blum)
(12) Arch. Record, July 1934, Title Page, pp. 5, 19 (DX–95a, b, c)
(13) Arch. Forum, March 1937, Title Page, pp. 219, 222 (DX–96a, b, c)
(14) Arch. Record, March 1940, pp. 5, 143 (DX–98a, b)
(15) Arch. Record, Sept. 1941, Title Page, pp. 41, 45 (DX–100a, b, c)
(16) Arch. Forum, Oct. 1942, Title Page, pp. 35, 43 (DX–101a, b, c)
(17) Arch. Record, Nov. 1945, pp. 5, 60 (DX–102a, b)
(18) Sweet's Catalog Service 1950, Sec. $\frac{6e}{5}$ , p. 3 (DX–103d)
(19) Sweet's Catalog Service 1953, Sec. $\frac{5e}{BL}$ , pp. 2, 3 (DX–107d, e)
(20) Sweet's Catalog Service 1954, Sec. $\frac{5e}{BLU}$ , pp. 2, 3 (DX–108b, c)
(21) Home Fed. Sav. & Loan—Photo No. 4 (DX–109c)
(22) Home Fed. Sav. & Loan—Photo No. 9 (DX–109d)

They rely particularly on the Hardy, Allen, McNeil, Wright, Edgecomb and Wehr patents; also upon the prior use as follows: Arch. Record, July 1934, p. 19, Hawkins, Cremens, Home Federal Savings & Loan, Chicago. Arch. Record, November 1945 at p. 60; Arch. Forum, March 1937, p. 222. They also rely upon

the plaintiff's other patent in suit, the Blum Design Patent No. 171,963.

The principal art relied upon by the defendants to invalidate Claim 1 of the mechanical patent is the Hardy Patent No. 163,996 and the 1954 Blumcraft Catalog reference. Defendants' witness Fishleigh through the use of these two references attempted to create a structure as defined by the plaintiff's claim. He testified (pp. 401, 403, 404 of Tr.) as follows:

"In other words, I have previously pointed out that this Hardy patent shows what has been referred to here as in-line rail, where the rail was right in line with the post. Then I go on to say it would have been an obvious mechanical expedient, if desired, to have used an intermediate laterally extending member 'D', rigidly connected to the post, such as illustrated in the 1954 Blumcraft of Pittsburgh Catalog, and to have fastened the clamping means and the rail to the end thereof in laterally spaced relation to the post. And what I am saying is that in effect that if one wanted to take and use this hand rail in offset relationship, that you could use the post and the horizontal part D of the clamping means with rather minor modifications, adjusted so that you could then clamp the rail to that horizontal portion and have a structure filly [sic] respondent. * * *

"In order to show how simple such an aggregation would be, I have prepared what I would call an adapter member. * * * Now, the upper part of that member conforms in cross-section substantially to the cross-section of the upper part of the post in the Hardy patent. The lower part of that member conforms substantially to the lower, to the shape and configuration of the vertical so-called triangular clamping member, or connecting member, in the Sweet's file, or the Blumcraft, the structure of the Blumcraft 1954 catalog of which this DX–102A to D inclusive is the model. Now, all that is necessary is to remove the post

from Hardy, put in the adapter member, take off the rail from the Blumcraft device, and we have the Hardy rail, mounted in an offset position with respect to the post instead of being in-line as they were in the Hardy structure itself."

On cross examination concerning his adapter member Fishleigh stated that it was new, and that the Hardy and the 1954 Blumcraft reference had not been combined together before:

"Q. But there is no other part that is the same as this (the adapter) that you know of?

A. In toto?

Q. Yes.

A. No." (p. 522)

He developed an entirely new member to combine them, and then it was apparently through hindsight. His attempt to produce the structure vividly demonstrates the unlikelihood that anyone skilled in the ornamental railing art would attempt to do so.

As to the McNeil Patent No. 1,165,193, heavily relied on by defendants, it cannot be used to invalidate plaintiff's patent. Although certain elements are the same McNeil was used as an anti-creeping device for railroad tracks, something far removed from the art in which the present invention resides.

In speaking on the issue of obviousness Judge Learned Hand in Reiner v. I. Leon Co., 285 F.2d 501, 503, 504 (2nd Cir. 1960) said:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not 'obvious' is to substitute our ignorance for the acquaintance with the subject of those

who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?"

In Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670, 675 (4th Cir. 1961), the Fourth Circuit Court of Appeals said that these general principles have guided their decisions for many years.

These factors were considered as to both the mechanical and design patents, and are set out in the foregoing discussion. For this reason the court will not linger on these points.

■■■ The test of invention where old elements are used in the alleged invention is whether those elements are used in a manner different from the previously known use in such a way that the alleged invention would not have been obvious to one skilled in the art. Preformed Line Products Co. v. Fanner Mfg. Co., supra, 328 F.2d at 272; Maytag Co. v. Murray Corporation of America, 318 F.2d 79, 81 (6th Cir. 1963). It is significant that the spacing connector in the Blum patent also serves as the clamping means, and this was a new function. The fact that numerous elements singly have been known for years to those skilled in the art does not necessarily invalidate a patent, for the patent may rest in the novel functions of these elements in combination. A combination of old elements may be patentable if they "perform, or produce a new, different or additional function or operation in the combination than that theretofore performed and produced by them." Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Entron of Maryland, Inc. v. Jerrold Electronics Corp., supra.

■■■ Had the court concluded that the combination of known elements was obvious to one having ordinary skill in the art it would not hesitate to hold the patent invalid in view of Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp. (1950), 340 U.S. 147 where at page 152, 71 S.Ct. 127 at page 130, the Court said:

"The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, * * * their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

The court should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. For patents are to "promote the Progress of Science and useful Arts." Article I, Sec. 8 of the Constitution. Their function is not to bestow a monopoly.

■■ A significant asset of Blum's mechanical patent was the flexibility allowed in combination with rigidity as is required in rails. This is shown by the following testimony of Louis Blum (Tr. p. 39):

"Q. What is the significance of this adjustability you referred to, why is that important?

A. Well, in the building construction there is nothing perfect, and without going to extensive measurements, and handfitting bevels and pitches, which we call them in stairway. For example, even though an architect's drawing may indicate certain measurements on a flight of stairs going up, a good example is the concrete, and they pour the concrete and the tolerance is so great that the holes that were drilled in there for let's say for fastening the post to the stairway, would create imperfect, not perfect as far as dimension is concerned, but say with the

bevels. Well, this eliminates all these problems by having it adjustable.

Q. What would you do if it weren't adjustable?

A. Well, they would have to be carefully measured, careful layouts made of the plans, and each member hand fitted."

Although it was not new in the art to have a rail offset from the post, it was novel to have the Blum type of connector for attaching the rail so as to give adjustability to the particular need and rigidity as is required for railings.

One of the most important features of the mechanical patent is the flexibility allowed in combination with rigidity. The rail portion can be adjusted when the clamping members are loose and may be moved, whereas when tightened they are completely rigid. Although the defendants attack the validity of the patent with numerous exhibits, particularly the Hardy and McNeil Patents, the court finds that none of the prior art shows this type of mechanical arrangement.

This court does not find that Blum developed the mechanical patent from Hardy, the earlier Blum patent, or from McNeil. Even if such a conclusion were reached, the court would nevertheless conclude that Blum's acts "in combining the pertinent elements of the prior art * * * achieved a result not obvious to mere mechanical skill." Preformed Line Products Co. v. Fanner Mfg. Co., 328 F.2d 265, 273 (6th Cir. 1964), cert. den'd 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed. 2d 51. Both mechanical and design patents of plaintiff represent more than a " 'mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, * * *.' Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151, 71 S.Ct. 127, 130, 95 L.Ed. 162," for here was a method by which to offset the railings with a minimization of the connecting factors, plus allowing adjustability to the particular need.

The mechanical patent was new and filled a need in the art which now enables the production of prefabricated railings of modern design producing a floating effect through the minimal connection between posts and rails. Accordingly this court finds patent No. 2,905,-445 valid.

## DISCUSSION OF ISSUE NO. IV—INFRINGEMENT OF MECHANICAL PATENT NO. 2,905,445

As earlier quoted from Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, at page 607, 70 S.Ct. 854, at page 855:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement."

As stated in Marston v. J. C. Penney Co., 353 F.2d 976, 985 (4th Cir. 1965), cert. den'd 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437, patent infringement is first determined by looking to the words of the claims of the patent:

"To determine whether the accused article infringes * * * we must look to the words of the claims. If

every essential element of the described combination, or its equivalent, is embodied [in the accused article, the plaintiff] is entitled to prevail."

### The Claims

The duplication of each of the elements of the Claims of the Blum patent by the accused Architectural Art structure is sufficiently demonstrated in Exhibits PX–103 and PX–107. They show the corresponding parts of the respective railings colored the same. (Blum, Tr. 34–41).

1. With respect to *Claim 1,* the Claim requires:

"In an ornamental rail structure, ornamental post means"

Both structures are ornamental railings and in each case there is an ornamental post, colored blue. The Claim next provides:

"Ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion"

In each case there is an ornamental rail having a dovetail-shaped base portion, colored yellow, and an upper hand-gripping portion, colored brown. The Claim continues:

"separate V-shape clamping means in juxtaposition forming a dovetail shape recess receiving and clamping the dovetail shape base portion of said rail means and exposing the upper portion of said rail means for hand-gripping"

In both the patented and accused structures, the yellow dovetail-shaped base portion of the ornamental rail is gripped by a pair of V-shaped clamping means, colored pink, in juxtaposition forming a dovetail-shaped recess. The Claim then requires:

"connecting means rigidly connecting said clamping means and said rail means in spaced relation to said post means"

The means for connecting the pink clamping means and the yellow and brown ornamental rail in spaced relation to the blue post are colored red in each exhibit. Finally, the Claim provides for:

"threaded bolt means passing through said clamping means forcing and retaining said clamping means together."

In each case there is a threaded bolt, colored gold, which is threaded into the threaded bore, colored green, within the pink clamping means of each railing assembly.

The duplication of the elements defined by Claim 1 of the Blum patent in the defendants' structure is evident. It is further apparent that the defendants have duplicated the unique feature of the Blum railing mechanism by which the clamping means and the connecting means are partly included within the same member, namely, the member extending horizontally from the post.

As demonstrated, there is no difference between the defendants' structure and that claimed in Claim 1 of the Blum patent. In attempting to avoid infringement, the defendants contend:

(1) that the yellow colored element is not really a "base portion" in the defendants' structure and that therefore the V-shaped pink elements do not grip a base portion, despite the fact that it is the lowest portion upon which the railing is based;

(2) that in defendants' structure "there is no means for connecting one clamp member separately to the post or bolting one clamp member to the other clamp member," despite the fact that there is no such requirement in the claim;

(3) that there is nothing in the defendants' structure which corresponds to the threaded bolt 16 of the Blum patent, despite the fact that the defendants' structure uses a threaded bolt to perform precisely the same function in the same way in the defendants' structure to force the clamping means together.

The defendants' structure falls clearly within Claim 1 of the Blum patent. The only differences between the defendants' structure and the embodiment illustrated

in the Blum patent are visual, and these visual differences in no way relate to the true invention or the Claims.

"'* * * If the patentee's ideas are found in the construction and arrangement of the subsequent device, no matter what may be its form, shape, or appearance, the parties making or using it are deemed appropriators of the patented invention, and are infringers.'" Fauber v. United States, 37 F.Supp. 415, 443, 93 Ct.Cl. 11 (1941).

2. With respect to *Claim 3* of the Blum patent, it calls for:

"In an ornamental rail structure, ornamental post means"

In both cases, as shown in the Exhibits PX–103 and PX–107, there are ornamental rail structures for an ornamental post, colored blue. Claim 3 next requires:

"ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion"

In each case there is an ornamental rail having the upper hand-gripping portion, and a dovetail-shaped base portion, colored yellow. The Claim next provides for:

"means connecting said rail means in spaced angular relation to said post means comprising a pair of separate clamping members, the first of said clamping members being rigidly affixed to said post means and extending outwardly therefrom, the second of said clamping members being connected to said first clamping member by threaded bolt means, said clamping members having complementary V-shape portions forming a dovetail recess receiving the dovetail shape portion of said rail means and exposing the upper portion of said rail means for hand-gripping."

In each case there is means connecting the rail to the post in spaced angular relation. In each case the connecting means comprises a pair of members having complementary V shaped portions forming a dovetail recess receiving the dovetail-shaped portion of the rail. In each case the first of said clamping members is rigidly affixed to the post. In the case of the plaintiff's structure, the first clamping member is a single piece. In the defendants' accused structure, the first clamping member is made up of two pieces which are joined together in the assembled railing. In the case of each of the railings, the second clamping member is connected to the first clamping member by a threaded bolt. In each case the ornamental rail is so gripped by its base portion that the upper portion is exposed for hand-gripping.

■ In the case of the infringement of Claim 3 by the defendants' structure, every element of the Claim finds correspondence in the accused railing assembly. The only difference other than visual between the accused structure and the embodiment of the patented structure illustrated in the patent is that the first clamping member in the patent is a single piece, while in the defendants' structure the first clamping member, performing the identical function, is made up of two pieces joined together in the assembled railing. It is well settled that the mere separation of a single member into two parts performing the same function does not avoid infringement. Abbott v. Barrentine Manufacturing Company, 255 F.Supp. 890, 899 (N.D.Miss.1966); No-Joint Concrete Pipe Co. v. Hanson, 344 F.2d 13 (9th Cir. 1965), cert. den'd 382 U.S. 843, 86 S.Ct. 79, 15 L.Ed.2d 83; Specialty Equipment & Mach. Corp. v. Zell Motor Car Co., 193 F.2d 515, 518 (4th Cir. 1952). In the latter case it was said that where a valuable contribution is made to the art, the patent is entitled to liberal treatment.

In attempting to avoid infringement of Claim 3 of the Blum patent, the defendants argue:

(1) that the first clamping member of the accused structure is not "separately rigidly affixed directly" to the post and the second clamping member is not "bolted directly and solely to the first clamping member," despite the fact that there are no such limita-

tions in the claim, which merely requires a pair of "separate clamping members" connected by a threaded bolt;

(2) that the accused structure has no element corresponding to the threaded bolt 16 of the Blum patent, despite the fact that the defendants' structure employs a threaded bolt to perform the same function in the same way to connect the clamping members together;

(3) that, as argued in connection with Claim 1, the dovetail portion of the ornamental rail is not a "base portion" and therefore the clamping members do not receive a base portion of the rail, despite the fact that the yellow-colored dovetail element in the defendants' structure is the lowest portion of the ornamental rail upon which it is based.

The accused ornamental railing structures respond fully to the mechanical invention as set forth in Claims 1 and 3 of the Blum mechanical patent. Claim 1 is infringed literally; the same is true of Claim 3, save that the "first clamping member" recited in the Claim finds response in two elements which are joined together to perform the same function in the accused structure. The accused structures are mechanically the same as the one embodiment in the invention described in the specification of the patent. The accused railings however differ in their visual appearance from the embodiment shown in the mechanical patent by virtue of the upward extension of the clamping members. The accused railing structures serve the purpose of the mechanical patent in suit by performing the same function in substantially the same way by virtue of producing a rigid clamping connection for connecting an ornamental railing in spaced relation to an ornamental post by means of separate v-shaped clamping means which receive and clamp the dovetail shaped base of the railing. Although the accused railing structure does not have a first clamping member which is separately, rigidly affixed directly to the post as in the patent, it appears evident that the accused telescoping connector which is attached directly to the post is used as an expedient to avoid reading directly on the plaintiff's patent. However, the second clamping member is bolted to the first clamping member pulling them together. Without this, of course, there could be no tightening or loosening of the clamping members so as to engage the doveshaped base portion of the rail.

There was much argument as to the base portion of the defendants' structure. This court concludes that merely because the sides of the base portion are lower, this does not prevent one from seeing the base portion as it should be seen. Infringement should not be that easily avoided.

Alterations in form, visually or with mechanical equivalents, do not avoid infringement. Here the two structures do the same work in substantially the same way and accomplish the same result, therefore, the two are the same. Entron of Maryland, Inc. v. Jerrold Electronics Corp., supra.

Accordingly, it is concluded that Patent No. 2,905,445 is infringed by the defendants.

### CONCLUSIONS OF LAW

(1) The court has jurisdiction of the parties and the subject matter involved.

(2) The Blum design patent No. D–171,963 is valid.

(3) The defendants have jointly and severally infringed the Blum Design Patent No. D–171,963 by making, using and selling railings installed at the C & S National Bank, Greenville, S. C.

(4) The Blum Mechanical Patent No. 2,905,445 is valid.

(5) The defendants have jointly and severally infringed Patent No. 2,905,445 by making, using and selling the ornamental railings installed at the Citizens and Southern National Bank, Greenville, S. C.

Plaintiff is entitled to judgment enjoining defendants, its officers, servants, agents, and those in privity with it from

any further infringement of the patents at suit, and to an accounting to determine the amount of damages to which the plaintiff is entitled as a result of the infringements.

And it is so ordered.

## Schedule "A"

April 20, 1954        L. BLUM        Des. 171,963

RAIL

Filed April 24, 1953

IN THE U. S. COURT OF CLAIMS

Blumcraft of Pittsburgh

v. U.S.    No. 38-63

Pltf.    Ex. No. 18

Sheets 12    Sheet No. 1

*INVENTOR.*

Louis Blum

BY William B Jaspert

attorney.

BLUMCRAFT OF PITTS. v. U.S.
Court of Claims No. 38-63

PX - 18

Blumcraft
Patent No. Des 171,963

PLAINTIFF'S
EXHIBIT
18

468

# UNITED STATES PATENT OFFICE

**171,963**
**RAIL**
**Louis Blum, Pittsburgh, Pa.**
**Application April 24, 1953, Serial No. 24,670**
**Term of patent 14 years**
**(Cl. D28—1)**

*To all whom it may concern:*

Be it known that I, Louis Blum, a citizen of the United States, residing at Pittsburgh, county of Allegheny and State of Pennsylvania, have invented a new, original, and ornamental Design for Rails, of which the following is a specification, reference being had to the accompanying drawing, forming a part hereof, in which:

The single figure is a view in perspective of a rail, showing my new design.

I claim:

The ornamental design for a rail, as shown.

References Cited in the file of this patent

Sweet's File, Architectural, 1952, section 6e, sub-section RE, page 14; section 6e, sub-section HA, page 7, and section 6e, sub-section BL, page 3, top left and right items.

"Schedule B"

Sept. 22, 1959          L. BLUM          2,905,445

ORNAMENTAL RAIL STRUCTURES

Filed June 16, 1955

Fig. 2

Fig. 1

Fig. 3

Fig. 4

INVENTOR.
Louis Blum
BY William B. Jaspert
Attorney.

UNITED STATES PATENT OFFICE

## CERTIFICATE OF CORRECTION

Patent No. 2,905,445                                                                        September 22, 1959

Louis Blum

It is hereby certified that error appears in the above numbered patent requiring correction and that the said Letters Patent should read as corrected below.

Column 2, line 64, strike out "and", first occurrence;  column 3, line 27, for "second" read — first —;  line 28, for "first" read — second —;  column 4, line 37, for "Hauhenstein" read — Hauenstein —.

Signed and sealed this 3rd day of April 1962.

(SEAL)
Attest:

ERNEST W. SWIDER
Attesting Officer

DAVID L. LADD
Commissioner of Patents

1

2,905,445
ORNAMENTAL RAIL STRUCTURES

Louis Blum, Pittsburgh, Pa., assignor to Blumcraft
of Pittsburgh, Pittsburgh, Pa., a firm

Application June 16, 1955, Serial No. 515,902

6 Claims. (Cl. 256—65)

This invention relates to new and useful improvements in ornamental rail structures, more particularly to means for mounting and fastening ornamental rails to wall brackets or supporting posts, and it is among the objects thereof to provide special clamping means for securing ornamental shaped rails at the under face thereof without engaging or obstructing the top and side faces of the rail to interfere with the gripping thereof.

It is a further object of the invention to provide special means for anchoring the rail clamping members to a hollow rail support.

It is still a further object of the invention to provide end caps for the ends of the rails and the top of the posts, which shall be secured therein by a wedging member, and which shall also be serviceable as a clamp anchoring means. These and other objects of the invention will become more apparent from a consideration of the accompanying drawing constituting a part hereof, in which like reference characters designate like parts and in which:

Fig. 1 is an isometric view in elevation, partially in section, of a fragmentary portion of ornamental hand rails and supporting posts;

Fig. 2, an exploded view of a portion of an ornamental rail and clamp therefor;

Fig. 3, an end elevational view, partially in cross-section, of an ornamental rail clamp post and clamp supporting bracket; and,

Fig. 4 is a side elevational view taken along the line 4—4 of Fig. 3.

In the drawing, the numeral 1 designates a dovetail shape rail supporting posts of hollow construction extruded of aluminum or the like; the numeral 2, an ornamental rail of similar shape supported on the post 1 by clamps 3. The rails 2 are of hollow construction and are provided with end caps 4, which are secured inside of the rail 2 by a wedging action, as will be hereinafter explained. The rail supporting post 1 is also provided with an end cap 5 of similar construction as the end caps 4, to which the clamping element 3 of the upper rail is secured, as shown in Fig. 3. With reference to Fig. 2 of the drawing, the dovetail shape hollow rails 2 are engaged by clamps generally designated by the numeral 3, which consists of a cylindrical member 6 having a threaded interior for receiving a stud 7 having a swivel end 8 pivotally mounted at 9, so that when inserted in an opening 10 of the rail supporting post 1, the swivel member 8 will assume the upright position, as shown in Fig. 1, and as shown in dotted lines in Fig. 2. By turning the barrel, or cylindrical member 6, on the threaded portion of the stud 7, it can be drawn up tight to cause the swivel end 8 of the stud 7 to abut the wall of the rail supporting post 1 to securely hold the barrel 6 thereon. The member 6 is provided with a reduced portion 11, which acts as a pilot or guide for a clamping cylinder 12, that has a cylindrical recess 13 for sliding engagement with the pilot element 11. Both the members 6 and 12 are provided with flat seating surfaces 14, with V-shaped notches 15, as is more clearly shown in Fig. 3 of the

2

drawing, so that when assembled, as shown in Fig. 3, they constitute a dovetail recess for receiving the base of the ornamental rail 2. A screw 16 passes through the end of the member 12 and into a threaded portion of the reduced pilot 11 of cylinder 6, and when the screw 16 is drawn up, it will force the cylindrical clamping element 12 to slide on the pilot element 11 to effect clamping engagement with the notched portion of cylinder 6 to firmly engage the rail element 2 and secure it in place.

The type of mounting and clamping element of Fig. 2 is utilized on the bottom and intermediate rails of Fig. 1 and the top rail, while it employs the clamping element of Fig. 2, utilizes a stud bolt 17 for mounting the cylindrical member 6 on the end closure 5 of the supporting post 1. This end closure 5, as shown in Fig. 1, is of dovetail shape and has a reduced portion 18 that fits in the inner wall of the supporting post 1 having sliding engagement therewith. The member 5 is recessed at 19 to form prongs 20, and a plunger 21 of dovetail shape 21 is disposed in the recess 19 where it may be drawn upward by means of a bolt 22. As the bolt is turned, the plunger 21, which is also of dovetail shape, will be drawn upward and spread the prongs 20 to effect clamping engagement with the rail post 1 that is serving the two-fold purpose of a clamp support for the clamp 6 and a closure for the top of the post 1.

The end closures 4 with the hollow rails 2, are of the same construction as the closure 5 on the post 1, to effect clamping engagement with the inner wall of the rails 2 to firmly secure the end closures in place.

It is evident from the foregoing description of this invention that ornamental rail clamps and closures made in accordance therewith, provide a simple expedient assembly and efficient support without interference with the free use of the railing and greatly enhance the ornamental effect where dovetail shape designs and extrusions are employed. It is evident that such railings may be assembled at the place of use with no tools required except a drill for drilling the openings 10 in the post for receiving the studs 7.

Although one embodiment of the invention has been herein illustrated and described, it will be evident to those skilled in the art that various modifications may be made in the details of construction without departing from the principles herein set forth.

I claim:

1. In an ornamental rail structure, ornamental post means, ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion, separate V-shape clamping means in juxtaposition forming a dovetail shape recess receiving and clamping the dovetail shape base portion of said rail means and exposing the upper portion of said rail means for hand-gripping, connecting means rigidly connecting said clamping means and said rail means in spaced relation to said post means and threaded bolt means passing through said clamping means forcing and retaining said clamping means together.

2. In an ornamental rail structure, ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion, clamping means supporting said rail means comprising a pair of separate clamping members having substantially V-shape portions joined to form a complementary dovetail shape and recess receiving and clamping the said dovetail shape base portion of said rail means with the upper portion of the rail means exposed for hand-gripping and holding means holding said separate clamping members together and rigidly clamping said rail means comprising internally threaded means on one side of said clamping means and a threaded bolt disposed within said clamping means and in threaded engagement with said internally threaded means.

2,905,445

**3**

3 In an ornamental rail structure, ornamental post means, ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion, means connecting said rail means in spaced angular relation to said post means comprising a pair of separate clamping members, the first of said clamping members being rigidly affixed to said post means and extending outwardly therefrom, the second of said clamping members being connected to said first clamping member by threaded bolt means, said clamping members having complementary V-shape portions forming a dovetail recess receiving the dovetail shape portion of said rail means and exposing the upper portion of said rail means for hand-gripping.

4. In an ornamental rail structure, ornamental post means, ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion, means for supporting said rail means on said post means comprising a pair of separate clamping members having notches joined to form a dovetail shape recess for receiving the dovetail shape base portion of said rail means with the upper portion thereof exposed for hand-gripping, the first of said clamping members having a recess, the second of said clamping members having means for attachment with said post means and having an interiorly threaded extension for sliding movement in the recess in the first said clamping member, and a bolt extending through said second clamping member into the interiorly threaded extension of said first clamping member for drawing said clamping members into clamping engagement with said rail.

5. In an ornamental rail structure, ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion, clamping means supporting said rail means comprising a pair of separate clamping members, each of said clamping members comprising V-shaped notch means and having an internal bore for receiving a threaded bolt, said V-shape notch means forming a dovetail shape recess receiving the dovetail shape

**4**

base portion of said rail means and exposing the upper portion of said rail means for hand-gripping, the internal bore of one of said clamping members being threaded for threaded engagement with a bolt and bolt means disposed within said internal bores and threadably engaging the threaded internal bore of one of said clamping members.

6. In an ornamental rail structure, ornamental post means, ornamental rail means having a dovetail shape base portion and an upper hand-gripping portion, means supporting said rail means on said post means comprising a pair of separate clamping members joined to form a dovetail shape recess receiving said dovetail shape base portion with the upper portion of said rail means exposed for hand-gripping, a first bolt with a swivel at one end and threaded at the other end, the first of said clamping members having a threaded end and receiving the threaded end of said first bolt, said post means having an opening for receiving the swivel end of said first bolt, the said swivel constituting an abutment within said post for retaining said first clamping member in rigid engagement with said post means, said first clamping member having an interiorly threaded extension at the end thereof opposite said threaded end, the second of said clamping members having a recess for receiving said extension and a second bolt extending through said second clamping member into the threaded extension of said first clamping member for drawing said members into clamping engagement with said rail means.

References Cited in the file of this patent
UNITED STATES PATENTS

| 450,127 | Wrigley | April 7, 1891 |
|---|---|---|
| 876,059 | Irons | Jan. 7, 1908 |
| 1,631,831 | Jones | June 7, 1927 |
| 1,795,857 | Hauhenstein | March 10, 1931 |
| 2,229,194 | Sklarek | Jan. 21, 1941 |